IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. 07-00063-02-CR-W-ODS |
| ) | |
| JERMAINE D. JONES, ) | |
| ) | |
| Defendant. ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on defendant Jones' Motion to Suppress Evidence (doc #86) and Motion to Suppress Statements (doc #87). For the reasons set forth below, it is recommended that these motions be denied.

I. INTRODUCTION

On February 7, 2007, the Grand Jury returned a seven count indictment against defendants Marlin E. Sanders, Jermaine D. Jones and Lee V. Harris.[1] Count One of the indictment charges that between January 1, 2006, and the date of the indictment, defendants Sanders, Jones and Harris conspired to distribute fifty grams or more of cocaine base. Count Two charges that on November 20, 2006, defendant Jones intentionally distributed cocaine base. Count Three charges that on November 20, 2006, defendants Jones and Harris, aiding and abetting each other, intentionally possessed with intent to distribute cocaine base. Count Four charges that on November 20, 2006, defendants Jones and Harris, aiding and abetting each other, being unlawful users of or addicted to a controlled substance, knowingly possessed a .357 caliber revolver. Count Five charges that on December 5, 2006, defendant Jones intentionally distributed cocaine base. Count Six charges that on December 6, 2006, defendants Sanders, Jones and Harris, aiding and abetting each other, intentionally possessed with intent to distribute fifty grams or more of cocaine base. Count Seven does not charge defendant Jones.

---

[1] Defendant Harris entered a guilty plea on April 11, 2007.

On December 3, 2007, an evidentiary hearing was held on defendant's motions to suppress. Defendant Jones was represented by appointed counsel F.A. White, Jr. The Government was represented by Assistant United States Attorney Matt Wolesky. The Government called Detective Troy Schwalm, Sergeant Greg Satter, Detective Greg Pelter and Detective Steven Campo of the Kansas City, Missouri Police Department as witnesses. No witnesses testified on behalf of the defense.

## II. FINDINGS OF FACT

On the basis of the evidence adduced at the evidentiary hearing, the undersigned submits the following proposed findings of fact:

1. On November 20, 2006, Detective Troy Schwalm was working as a member of the Street Narcotics Unit in an undercover capacity. (Tr. at 3) That afternoon, the Street Narcotics Unit was conducting a buy/bust operation in the area of 9th and Harrison, an area referred to as Jurassic Park. (Tr. at 3) The Street Narcotics Unit was working in that area because they had received numerous complaints regarding narcotics activity in and around the park. (Tr. at 4)

2. Prior to Detective Schwalm's arrival at the park area, surveillance officers had set up and maintained a view of the area. (Tr. at 4) Normally, the surveillance officers will identify subjects who appear to be conducting narcotics transactions and relay that information to Detective Schwalm. (Tr. at 4) The surveillance officers will then maintain a watch on Detective Schwalm while he is in the park. (Tr. at 4) Detective Schwalm wears a transmitting device so that the surveillance officers can also hear what is being said. (Tr. at 4-5) The surveillance officers cannot talk back to Detective Schwalm. (Tr. at 5)

3. On November 20, 2006, Detective Schwalm went into the park and positioned himself to be approached by individuals trying to sell narcotics. (Tr. at 5) Detective Schwalm was sitting on a park bench on the northern side of the playground area when he saw an individual (later identified as defendant Jermaine Jones) coming in his direction from a fenced area along the I-70 overpass. (Tr. at 6) Detective Schwalm got up and went to meet Jones. (Tr. at 6) Detective Schwalm had never had any contact with Jones prior to this occasion. (Tr. at 10) Jones asked Detective Schwalm what he wanted and Schwalm replied that he wanted a twamp, referring to $20 worth of crack cocaine. (Tr. at 6) Detective Schwalm further indicated that he only had $16 to spend. (Tr. at 6) Jones was agreeable to that and pulled out a bag of crack cocaine. (Tr. at 6) Jones selected a single bag from a larger bag, tore out a portion of the crack cocaine and handed it to Detective Schwalm. (Tr. at 6) Detective Schwalm gave Jones the money. (Tr. at 7) All of the money used in undercover transactions is prerecorded by photocopies. (Tr. at 7) The officers photocopy the serial numbers so that they have something to refer to after the transactions are made and for the cases brought later on. (Tr. at 7) The money that Detective Schwalm used to purchase the crack cocaine from defendant Jones was photocopied prior to the transaction. (Tr. at 7)

2

4. Detective Schwalm asked Jones how he could get ahold of him in the future and if he had a cell phone. (Tr. at 7) Jones gave Detective Schwalm his cell phone number which Schwalm then dialed into his own cell phone to record the number. (Tr. at 7) That was the last contact Detective Schwalm had with Jones on that afternoon. (Tr. at 7) As he was moving out of the area, Detective Schwalm transmitted to his surveillance officers that it was a "good deal" meaning that he was able to conduct the transaction. (Tr. at 8) The surveillance officers relayed defendant Jones' position inside the park and a description of what he was wearing to patrol officers who were on stand-by so that they could make the arrest. (Tr. at 9) Detective Schwalm did not take any overt action in making the arrest so that he could preserve his undercover status. (Tr. at 9) After Jones was placed in custody, Detective Schwalm conducted a "drive-by" to make sure the person they had in custody was the person who had sold Schwalm the crack cocaine. (Tr. at 9-10)

5. Officers Greg Satter (now a sergeant), Matt Gardner (now a sergeant) and Paul Williams were on standby to assist the Street Narcotics Unit Undercover Squad on November 20, 2006. (Tr. at 14) Upon completion of the buy, the officers were given a description of the individual who sold the narcotics and directed to the place in the park where he would be located. (Tr. at 15) The officers entered the park and approached the individual (later identified as defendant Jones). (Tr. at 15-16) Jones was sitting on a park bench with his arm around a female (later identified as defendant Harris). (Tr. at 16, 20) Given that Jones had been involved in a drug transaction and the fact that guns are often involved in drug transactions, the officers ordered Jones to show his hands. (Tr. at 17) Jones put his left hand inside his pocket. (Tr. at 17) Officer Satter grabbed Jones' hand and pulled it out of his pocket. (Tr. at 17) At that point, Officer Williams observed a gun and stated, "Gun." (Tr. at 17) The gun was on the park bench between Jones and Harris. (Tr. at 17-18) The officers pulled Jones up and placed him under arrest. (Tr. at 17) Officer Williams picked up the gun. (Tr. at 17) Officer Gardner observed a bag of crack cocaine fall from Harris' lap as she was pulled out of her seat. (Tr. at 19) Officer Satter took the money Jones had on his person and checked it against the serial numbers of the buy money. (Tr. at 20) The serial numbers matched. (Tr. at 20) The arrest took place at approximately 3:00 p.m. (Tr. at 29)

6. On November 21, 2006, at approximately 7:30 a.m., Detective Greg Pelter conducted an in-custody interview of defendant Jones at police headquarters. (Tr. at 23-24) Detective Pelter started out by obtaining background information from Jones such as his name, address, relatives, and any scars, marks or tattoos. (Tr. at 24) Jones did not appear to have any trouble understanding Detective Pelter or responding to his questions. (Tr. at 25) Jones did not appear to be intoxicated or otherwise impaired. (Tr. at 25) Detective Pelter asked Jones how far he went through school. (Tr. at 27) Jones told Detective Pelter that he was a high school graduate and that he had ten months of business school. (Tr. at 28) Detective Pelter had Jones read aloud a Miranda Waiver form. (Tr. at 27) The form stated:

> Before being asked any questions, I have been told of my right to remain silent, that anything I say can and will be used against me in court, that I have the right to talk with a lawyer and to have the lawyer with me during questioning. I have been told that if I cannot afford a lawyer that one will be appointed for me, at no cost to me, before I am questioned. I have also been told that I can stop talking at any time.

3

**I understand all of these rights and I am willing to talk to you.**

> (Government's Ex. 1) Detective Pelter asked Jones if he understood the form and Jones responded that he did. (Tr. at 27) Jones signed the Miranda Waiver form. (Tr. at 26; Government's Ex. 1)

7. After defendant Jones signed the waiver form, Detective Pelter started interviewing him. (Tr. at 28) Detective Pelter testified that Jones answered his questions. (Tr. at 28) Jones told Detective Pelter that he had been smoking crack and selling crack for about three months. (Tr. at 30) Jones stated that he usually bought about three eight balls of crack a day for $235. (Tr. at 30-31) Sometimes, Jones would smoke two of the three eight balls that he had bought. (Tr. at 31) Jones would take the rest of the crack and piece it up into dimes and sell it. (Tr. at 31) Jones told Detective Pelter that on November 20, he and his girlfriend were sitting in the park selling crack cocaine. (Tr. at 31) Jones said that he had just sold some crack a few minutes before the police came. (Tr. at 31) Jones also said that he threw some crack, but the police did not find it. (Tr. at 31) According to Jones, when the police searched him, they found the money that he had made from the sale of crack cocaine that day. (Tr. at 31) Jones further told Detective Pelter that the police had seen crack cocaine fall off his girlfriend's lap. (Tr. at 31) Jones said that he and his girlfriend had been together for approximately three years and that he actually considered her his wife. (Tr. at 31) Jones stated that his girlfriend/wife had bought the gun about five months ago. (Tr. at 31) The gun was used for protection while they were selling their crack cocaine. (Tr. at 31)

8. Detective Pelter testified that he did not threaten or trick defendant Jones to get him to answer the questions. (Tr. at 28-29) Detective Pelter characterized Jones as cooperative. (Tr. at 29) The interview concluded at 8:10 a.m. (Tr. at 28)

9. On December 7, 2006, at approximately 9:33 a.m., Detective Steven Campo conducted an in-custody interview of defendant Jones at police headquarters regarding a narcotics arrest that took place at approximately 1:40 in the afternoon, the previous day. (Tr. at 35-36, 46) Detective Campo began the interview by obtaining background information from Jones such as his name, address, relatives, high school, and things of that nature. (Tr. at 36-37) Jones did not appear to have any trouble understanding Detective Campo or responding to his questions. (Tr. at 37) Jones did not appear to be under the influence of any type of alcohol or other narcotic. (Tr. at 37) Detective Campo asked Jones about his education level and Jones responded twelfth grade. (Tr. at 39) Detective Campo had Jones read aloud a Miranda Waiver form. (Tr. at 37) Detective Campo asked Jones if he understood his rights and Jones responded that he did. (Tr. at 39) Jones signed the Miranda Waiver form. (Tr. at 38-39; Government's Ex. 2)

10. Defendant Jones agreed to make a formal statement. (Tr. at 40) Government's Exhibit 3 is the formal statement of Jermaine Jones. (Tr. at 41) As part of the statement, Detective Campo again advised Jones of his rights and Jones again waived those rights:

> Q. Have you been advised that you have the right to remain silent, that any statement you make may be used against you as evidence in court, that you have the right to the presence of an attorney either retained by you or one appointed for you without cost, and that the

4

> > attorney can be present while you are being questioned?
>
> A. Yes.
>
> Q. Under these conditions are you willing to waive that right and make a statement relating to the Narcotics Violation/Arrest knowing that it can be used against you in the event of a trial?
>
> A. Yes.

(Government's Ex. 3)  In the statement, Jones made various admissions relating to drug usage and possession.  (Government's Ex. 3)  The last question Detective Campo asked Jones was: "Is there anything else you wish to add to this statement?" (Tr. at 43; Government's Ex. 3)  Jones replied, "I made a mistake and I apologize for the inconvenience.  I need some help." (Tr. at 43; Government's Ex. 3)  Jones signed each page of the statement to show that he had read each page and agreed with the information transcribed.  (Tr. at 43)  The interview concluded at 10:30 a.m.  (Tr. at 40)

### III. DISCUSSION

Defendant Jones seeks to suppress evidence seized as a result of a search of defendant on November 20, 2006, and statements obtained from defendant on November 21 and December 7, 2006.

A. Motion to Suppress Evidence

In support of his motion to suppress evidence, defendant argues that any search of his person was unlawful in that it was conducted without a warrant, without probable cause and under no exception to the warrant requirement.  (Motion to Suppress Evidence at 2)

A warrantless arrest is proper if it is supported by probable cause.  "To find probable cause to make a warrantless arrest, the facts and circumstances within the officers' knowledge must be sufficient to justify a reasonably prudent person's belief that the suspect has committed or is committing an offense."  United States v. Roberson, 439 F.3d 934, 939 (8th Cir.), cert. denied, 127 S.Ct. 409 (2006).  The Court finds that probable cause clearly existed to arrest defendant Jones.  Based on the facts that a suspect had just sold crack cocaine to an undercover police officer, the suspect's location and description had been provided by surveillance officers to the arresting officers

and a person matching the description of the suspect was found in the location provided,[2] the arresting officers reasonably could have concluded that Jermaine Jones had committed or was committing an offense.

After placing defendant Jones under arrest, the officers properly conducted a search of Jones' person incident to his arrest. "[I]n the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a 'reasonable' search under that Amendment." United States v. Robinson, 414 U.S. 218, 235 (1973).

It appears from defendant's motion that he is particularly concerned with the seizure of the handgun which forms the basis for Count Four of the indictment. (Motion to Suppress Evidence at 2) As set forth in defendant's motion, the officers retrieved the handgun "in the proximity of defendant Jones and co-defendant Lee Harris." (Id.) The evidence presented at the suppression hearing was that the gun was on the park bench between defendants Jones and Harris. (See Fact No. 5, supra) Therefore, the seizure of the handgun did not result from any search of defendant's person or any other type of search for that matter. The officers were obviously justified in seizing a weapon that they saw on the park bench for officer safety reasons.

B.  Motion to Suppress Statements

In support of his motion to suppress statements, defendant argues that he was pressured into talking to the detectives and that although he read out loud, indicated that he understood and then signed Miranda forms, he did not really understand his rights. (Motion to Suppress Statements at 2)

In United States v. Jones, 23 F.3d 1307 (8th Cir. 1994), the Eighth Circuit Court of Appeals set forth the following discussion about the validity of a Miranda rights waiver:

> "The inquiry [into the validity of a waiver] has two distinct dimensions. ... First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to

---

[2](See Fact Nos. 3 through 5, supra)

> abandon it. Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived."

Id. at 1313 (quoting Moran v. Burbine, 475 U.S. 412, 421 (1986)).

The evidence presented at the hearing shows that defendant Jones graduated from high school and had attended ten months of business school, that Jones read his Miranda rights aloud on November 21 and again on December 7, 2006, that he told the Detective Pelter and Detective Campo that he understood his rights and that he signed a Miranda waiver on each of these days prior to being interviewed. (See Fact Nos. 6 and 9, supra) There was no evidence presented that defendant was coerced, intimidated or incapacitated in any way when he was given his Miranda rights or when he signed the Miranda waivers. Instead, Detective Pelter testified that defendant Jones did not appear to have any trouble understanding Pelter or responding to his questions; that Jones did not appear to be intoxicated or otherwise impaired; that Jones was cooperative; and that Pelter did not threaten or trick Jones to get him to answer the questions. (See Fact Nos. 6 and 8) Detective Campo testified that defendant Jones did not appear to have any trouble understanding Campo or responding to his questions and that Jones did not appear to be under the influence of any type of alcohol or other narcotic. (See Fact No. 9, supra)

The Court finds that defendant Jones was fully advised of his rights, that he understood his rights and that he voluntarily and intentionally waived those rights and agreed to talk to the officers.

IV. CONCLUSION

Based on the foregoing, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Jones' Motion to Suppress Evidence (doc #86). It is further

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying defendant Jones' Motion to Suppress Statements (doc #87).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report

and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain error or manifest injustice.

                                                */s/ Sarah W. Hays*
                                                SARAH W. HAYS
                                       UNITED STATES MAGISTRATE JUDGE